## COX et al. v. TERRE HAUTE & I. R. CO.

### In re CENTRAL TRUST CO. OF NEW YORK.

(Circuit Court, D. Indiana. May 23, 1903.)

### No. 9,395.

1. RAILROADS—LEASE IN VIOLATION OF PUBLIC POLICY—RECOVERY OF RENTAL.
   There can be no recovery of rental for the use of a railroad delivered by the company owning the same to another company, and operated by the latter under a lease which was void, not only because ultra vires, but also because forbidden by public policy.

2. SAME—RIGHTS OF MORTGAGEE—RECOVERY OF RENTAL FROM RECEIVER OF LESSEE.
   A mortgagee of a railroad which had been leased to another company by a lease which was void, and which at the time a suit was instituted to foreclose the mortgage was being operated by a receiver of the lessee at a loss, the deficit being paid from other funds of the receivership, who with knowledge of such fact permitted such receiver to continue in possession and received the benefit of his expenditures in keeping the property in operation until a sale under the mortgage, instead of applying for a receiver therefor in the foreclosure suit, is not entitled to recover rental for the property during such time from the receiver.

In Equity. In the matter of the intervening petition of the Central Trust Company of New York.

In 1889 the Terre Haute & Indianapolis Railroad Company, hereinafter called the Terre Haute Company, owned and operated its own line of railroad between Indianapolis, Ind., and the state line west of Terre Haute. It also was in possession of and operating the line of the St. Louis, Vandalia & Terre Haute Railroad Company extending from the western state line of Indiana to St. Louis. This Vandalia road was held under a so-called lease, which was afterwards adjudicated to be invalid and ultra vires by the Supreme Court of the United States. 145 U. S. 393, 12 Sup. Ct. 962, 36 L. Ed. 741. The Terre Haute & Indianapolis Railroad Company was also at that time in possession of and operating, under a somewhat similar lease, a line from Terre Haute to South Bend, Ind. This lease has since been held ultra vires. 88 Fed. 913, 32 C. C. A. 130.

In the same year the Indiana & Lake Michigan Railroad Company, a consolidated corporation of Indiana and Michigan, was organized to construct and operate a railroad connecting with the Logansport line of the Terre Haute Company at South Bend, and extending to St. Joseph, Mich., a lake port. The Indiana & Lake Michigan Railway Company, hereinafter called the Lake Michigan Company, being merely a paper corporation, the Terre Haute Company entered into a contract with it called a "lease," which is Exhibit B of the intervening petition. At the same time the Terre Haute Company, as a part of the same transaction, acquired all of the stock of the

¶ 1. See Railroads, vol. 41, Cent. Dig. § 432.

Lake Michigan Company, and the officers and directors of the Lake Michigan Company were all officers and directors of the Terre Haute Company.

The so-called Lake Michigan lease, dated June 4, 1889, provided that the Lake Michigan Company should make a mortgage to secure $480,000 of 5 per cent. bonds, and apply the proceeds of said bonds to the construction of its proposed line of railroad. When completed the road was to be turned over to the Terre Haute & Indianapolis Company for a period of 99 years, during which time the Terre Haute Company was to operate the road, retaining 75 per cent. of the gross receipts for its own use, and appropriating the remaining 25 per cent. of the gross receipts of said Lake Michigan road to the payment of taxes on the Lake Michigan property and of the interest coupons on said $480,000 bond issue. In case the 25 per cent. was insufficient to pay the interest, the deficiency was to be advanced by the Terre Haute Company by way of loan to the Lake Michigan Company. The Terre Haute Company also agreed to guaranty the payment, principal and interest, of said Lake Michigan bonds.

Pursuant to this agreement of June 4, 1889, a mortgage was executed by said Lake Michigan Company to the Central Trust Company of New York, trustee, and to a co-trustee, who has since died, to secure $480,000 of bonds. A copy of the mortgage is attached to the petition as Exhibit A. The mortgage covered all of the property, real and personal, then owned or thereafter acquired by the Lake Michigan Company. On each of said bonds the following guaranty was executed by the Terre Haute Company:

"The Terre Haute and Indianapolis Railroad Company, a corporation created under the laws of the state of Indiana, in consideration of a ninety-nine years lease of the railroad mentioned in the within bond, does hereby guaranty the payments of the principal and interest of said bond according to the terms and conditions thereof."

The entire bond issue was then sold, and the Lake Michigan road built with the proceeds. The road, having been constructed, was accepted by the Terre Haute Company pursuant to the provisions of said contract of June 4, 1889. The Terre Haute Company took possession in 1890, and thereafter retained possession and operated said road continuously until the appointment of a receiver in this cause, November 13, 1896. During that time the Terre Haute Company complied with the terms of its contract, paid the taxes and maturing interest on said Lake Michigan bonds, up to and including the coupon which fell due March 1, 1896, which represented the interest for the preceding six months. On September 1, 1896, the Lake Michigan coupon maturing on that day was defaulted. From March 1, 1896, until November 13, 1896, the Terre Haute Company had possession of and collected the earnings of said Lake Michigan Railroad, but did not appropriate 25 per cent. of the gross earnings for said period, nor any part thereof, to pay interest on said Lake Michigan bonds, and has never done so, and has paid nothing for the use of said Lake Michigan road during said period.

The gross income from March 1, 1896, to November 13, 1896, of the Lake Michigan road received by the Terre Haute Company was $48,596.72. Twenty-five per cent. of said gross income amounted to $12,149.18. The interest accruing on the Lake Michigan bonds during this same period amounted to $16,866.67. The total operating expenses paid by the Terre Haute Company on account of said Lake Michigan road during the same period were $52,875.62, exceeding the gross income by $4,278.90. In October, 1896, the original bill was filed in this case by Mark T. Cox et al., in behalf of the bondholders of the Terre Haute & Peoria Railroad. The Terre Haute & Indianapolis Railroad Company had, since the execution of the Lake Michigan contract of June 4, 1889, entered into possession of another line of road from Terre Haute to Peoria, under a somewhat similar lease. In 1893 the Peoria lease had been validated by an act of the Indiana Legislature. The Peoria lease was exhibited with the bill marked "Exhibit B." The bill recited that under this Peoria lease 30 per cent. of the earnings of the Peoria road were to be received by the Terre Haute Company as a trust fund for the payment of taxes and bonded interest of said Peoria road, the Terre Haute Company retaining the other 70 per cent. for its own use. The bill recited the history of the Terre Haute Company and its possession of the

various lines above mentioned under leases. It stated that a default had taken place on the part of the Terre Haute Company under this lease, and that for more than a year the Terre Haute Company had received and retained the 30 per cent. belonging to the Peoria road, and had mixed the same with its own funds. The bill further stated that the Terre Haute Company was in an embarrassed condition, and asked that the Terre Haute Company be enjoined from further misappropriating the lease percentage of the Peoria earnings, and that it be required to specifically perform the contract, and that if necessary a receiver be appointed of the funds received by the Terre Haute Company from the operation of the various leased lines operated by it, or that if the Terre Haute Company be insolvent a receiver be appointed to operate its railroad and leased lines "and to preserve said lease."

At the time of filing the bill an order was entered requiring the Terre Haute Company to show cause why it should not be required to pay over the 30 per cent. of the Peoria income to the bondholders of the Peoria road. On November 13, 1896, this order to show cause was returnable. The Terre Haute Company thereupon brought in an answer to the bill admitting its insolvency, and asking for a receiver of its own road and its leased lines.

On that day the complainant amended its bill by inserting the following:

"And now come the complainants, and move to amend their bill of complaint filed herein by adding at the end of paragraph 12, on page 28, the following paragraph, viz.:

" 'And your orators further aver that at the time of preparing the bill herein it was apprehended that the defendant might become insolvent, but now, in point of fact, your orators are informed and believe, and therefore aver, that insolvency has in fact occurred, and that said defendant is wholly unable to pay its current debts and obligations; that some of its funds have been attached by certain of its creditors, and other suits or attachments are threatened, and that unless a receiver be appointed to take possession of its property and operate the same its assets will be liable to be seized or levied upon at the suit of divers creditors, its assets wasted and sacrificed, its current operations embarrassed or arrested, its system disintegrated, and great and irreparable loss ensue to its creditors and the public by reason of its consequent inability to discharge its duties as a common carrier, and the funds specifically appropriated for the payment of interest on your orator's bonds diverted and lost; and a receiver is therefore necessary to take possession and custody of all the railroads of the defendant owned, leased, and operated by it, and all other property belonging to the defendant, and to maintain and operate its said railroads under the order of the court for the benefit of the various parties in interest.' "

At the same time the prayer to the bill was amended so that as amended the prayer of the bill read as follows:

"To the end, therefore, that your orators may have that relief which they can only obtain in a court of equity, they pray that an account may be taken by and under the direction and decree of this honorable court, for the purpose of ascertaining what the gross earnings of said Terre Haute & Peoria Railroad property have been since the 31st day of October, 1895, and what sum defendant has received and misappropriated that should have been applied by defendant to the payment of interest on said Terre Haute & Peoria Railroad bonds due and payable at the office of the Union Trust Company of New York, in New York City, on the 1st day of September, 1896, and that a decree be entered against defendant for the principal sum of said interest, together with interest thereon from and after said 1st day of September, 1896, and defendant be required to pay the same, and be also required to specifically perform said contract of October 1, 1892, and be enjoined during the pendency of this action from using or appropriating any of the thirty per cent. of the gross earnings of said Terre Haute & Peoria Railroad's property, except in the manner and at the times specified in said contract of October 1, 1892, and also that upon the final hearing of this action said defendant be perpetually enjoined from using or appropriating said thirty per cent. of gross earnings, except as in said contract specified; and that a receiver be appointed for said Terre Haute & Indianapolis Railroad Company to operate its railroad and its leased lines, and to preserve said leases in

so far as may be possible in the interests of all the creditors of the said Terre Haute & Indianapolis Railroad Company, according to their respective and lawful priorities, and without undue preference of one creditor or set of creditors over the other; and that your orators may have all such other and further relief in the premises as to the circumstances of this case may require and to your honors seem meet; and may it please your honors to grant unto your orators a writ of subpœna, to be directed to the said the Terre Haute & Indianapolis Railroad Company, commanding it, at a certain time and under certain penalty to be therein limited, to appear before this honorable court, and then and there full, true, direct, and perfect answer make under oath to all and singular the premises, and further to perform and abide such further order, direction, and decree herein as to this honorable court shall seem agreeable to equity and good conscience."

The Terre Haute Company at once filed its answer, substantially admitting the allegations of the bill, and concluding with the following paragraph and prayer:

"And, further answering the amended bill of complaint, defendant admits the truth of the averments in the twelfth paragraph of the bill of complaint as amended, that the insolvency of the defendant company has in fact occurred, and that the defendant company is wholly unable to pay its current debts and obligations; and defendant avers the truth to be that owing to the well-known financial embarrassments of the defendant, by reason of such insolvency, some of the funds of defendants have already been attached by certain of its creditors, and suits and attachments by other creditors are threatened, and that, unless a receiver be appointed to take possession of its property and operate the same, defendant's assets will be liable to be seized and levied upon at the suit of divers creditors, its assets lost, wasted, and sacrificed, its current operations embarrassed or arrested, and its system disintegrated, and great and irreparable loss ensue to its creditors and to the public by reason of its constant inability to discharge its duties as a common carrier, and the funds for the payment of interest on its various obligations diverted and lost; and defendant believes a receiver is necessary to take possession and custody of the defendant's railroad, and the roads leased and operated by it, and all other property belonging to the defendant, and to maintain and operate the same under the order of the court for the benefit of the various parties in interest.

"Wherefore the defendant joins in the prayer of the complainants for a receiver and for all other proper relief."

On the same day, November 13, 1896, Judge Woods appointed a receiver in this court, and in a similar proceeding made a similar appointment in Illinois for the Illinois property. No bill was filed in the state of Michigan, and no receiver was appointed in that state, although 25.05 miles of the Lake Michigan road are in the state of Michigan.

The order appointing the receiver directed him to take possession of and operate all of the railroads and property of the Terre Haute & Indianapolis Railroad Company, "including such railroads and property as the said Terre Haute & Indianapolis Railroad Company holds, controls, or operates, under lease or otherwise, in his discretion, and in such manner as will in his judgment produce the most satisfactory results." It was further provided "that said receiver is hereby authorized in his discretion, from time to time, out of the funds coming into his hands, to pay the expenses of operating said property." The receiver was also ordered to pay the unpaid loss and damage and supply claims, traffic car mileage, balances, current and unpaid pay rolls, and vouchers accruing during the six months prior to the appointment of a receiver. The order of appointment further provided that:

"And it is further ordered, adjudged, and decreed that the said receiver keep true and accurate books of account showing the receipts derived from the operation of the said railroads, and the manner and purpose of the expenditures thereof, and that in said books of account he keep separate and distinct accounts showing the amount of the gross earnings derived from the operation of the Terre Haute & Peoria Railroad Company, and in like manner separate accounts showing the amount of the gross earnings derived from the operation of each of the other railroads leased by the said defendant

company, and separate accounts showing the gross earnings derived from the operation of the railroad of the defendant company itself; that thirty per cent. of the gross earnings derived from the operation of the said Terre Haute & Peoria Railroad Company, and twenty-five per cent. of the gross earnings derived from the operation of Terre Haute & Logansport Railroad Company, and of the Indiana & Lake Michigan Railway Company, respectively, and thirty per cent. of the gross earnings derived from the operation of the St. Louis, Vandalia & Terre Haute Railroad Company, be respectively set apart and held by the said receiver as a separate and distinct fund in each case, be deposited by him in separate bank accounts, specially designated so as to indicate the property from which such deposits are derived in each case, and that no part of such percentages so set apart and deposited be paid out or applied except on the special order of this court, made upon notice to the complainants herein or their solicitors and such other parties as may hereafter appear in this cause.

"And said receiver shall make monthly reports to this court showing the receipts aforesaid, and the cost of operation of each of the said leased lines of the main line of railroad, and also showing the method by which the incomes and expenses of said lines are respectively ascertained, and, in case the balance óf the gross earnings derived from the operation of any of the said leased lines shall be insufficient to meet the expenses of the same, then the said receiver shall advance and meet any such deficiency out of the gross earnings of the main line of railroad of the defendant company if the same shall be sufficient therefor, and if not sufficient he shall report the matter to this court, and apply for instructions in the premises, having first given notice to all parties to this suit of the time and place of such application."

In compliance with this order the Terre Haute Company surrendered possession of all of its property and leased lines, including that part of the Lake Michigan road in the state of Michigan as well as the part in Indiana. The receiver retained possession of and operated the Lake Michigan road as a part of the Terre Haute system continuously until February 28, 1899. During the receiver's operation he did not offer to surrender possession thereof, nor did the Terre Haute Company offer to procure or make such surrender, nor did said Terre Haute Company make any motion in this cause asking that the court direct such surrender. In January, 1898, a petition of Cox et al. was pending in this cause asking for an order of court directing the receiver to pay the interest on the Peoria mortgage which had accrued prior to the receivership. Answering this petition of Cox et al., the Terre Haute Company embodied in its answer the following:

"This defendant is advised that the order made herein appointing a receiver, and directing special funds to be kept by him, does not and was not intended to bind the receiver to pay the rentals stipulated in the leases of the Terre Haute & Peoria Railroad Company, the Indiana & Lake Michigan Railway Company, or the Terre Haute & Logansport Railroad Company to this defendant, or to affect in any manner the rights of this defendant or any of its creditors in said funds, or against the claims of the plaintiff or any of said lessors, as they might thereafter be determined. This defendant is informed that the plaintiffs give out that the effect of said order is to require the receiver to pay the rentals stipulated in said lease of the Terre Haute & Peoria Railroad Company to this defendant. This defendant, therefore, asks the direction of the court, and prays that, if such be the effect of the order, that it be modified so as to relieve the receiver from any obligation beyond his net earnings from said Terre Haute & Peoria Railroad, said Indiana & Lake Michigan Railway, and said Terre Haute & Logansport Railroad, or otherwise, in the interest of the general and unsecured creditors of this defendant, that the receiver be directed to surrender possession of each of said railroads."

No action was taken by the court upon the above suggestion.

Neither the Lake Michigan Company nor the Central Trust Company of New York, its mortgagee, were parties to this suit during the receiver's operation of said Lake Michigan Railroad.

On November 27, 1896, petitioner commenced an independent proceeding in this court for the foreclosure of said Lake Michigan mortgage, seeking also

by its bill to recover on said guaranty of said bonds made by said Terre Haute Company. A similar proceeding was at the same time commenced in the United States Circuit Court for the Western District of Michigan,. Southern Division. These bills contained a general prayer for a receiver, but no application for appointment of a receiver was ever made and no receiver was appointed in these proceedings.

It was alleged in said bills filed by petitioner that the receiver had been appointed in this suit, and that he had possession and control of said Indiana & Lake Michigan Railway, and was operating the same as such receiver;. that said Indiana & Lake Michigan Railway Company was insolvent and wholly unable to pay its debts, and that its property was less in value than the amount of its mortgage bonds, and that the mortgage security was inadequate; that the payment of its bonds was guarantied by the Terre Haute Company.

On February 1, 1897, the Terre Haute Company filed its demurrer to. so much of said bill of complaint as sought to charge it with any liability on account of its guaranty of said Indiana & Lake Michigan bonds, on the ground that said guaranty was ultra vires and void. On July 22, 1897, this demurrer was overruled. In the meantime, on April 26, 1897, the original bill was amended by adding thereto, as Exhibit B, a copy of the contract between the Indiana & Lake Michigan and the Terre Haute & Indianapolis companies. for the operation by the latter of the Indiana & Lake Michigan Railway. The execution of this contract and some of its terms had been alleged in the original bill, and it is the same contract a copy of which is attached to the amended intervening petition herein as Exhibit B. On August 25, 1897, the Terre Haute & Indianapolis Railroad Company filed its answer to said amended bill, and denied any and all liability upon its guaranty of the Indiana & Lake Michigan bonds, and by reason of said contract, upon the ground that both said guaranty and said contract were ultra vires, and therefore void. On September 16, 1877, a general replication was filed to this answer. On November 22, 1897, a supplemental bill was filed, showing continued default for six months in the payment of interest on said Indiana & Lake Michigan mortgage bonds, and that by reason thereof, pursuant to the terms of the mortgage, the principal of the bonds had become due and payable. On December 6, 1897, the Terre Haute & Indianapolis Railroad Company filed its answer to this supplemental bill, and renewed its defense of ultra vires. On the same day a general replication was filed to this answer. On June 16, 1898, a final decree was entered foreclosing said mortgage, and ordering the sale of the Indiana & Lake Michigan Railway property. In this final decree it was ordered, adjudged, and decreed that the guaranty made by the Terre Haute & Indianapolis Railroad Company, as set forth in the bill of complaint, of the Indiana & Lake Michigan bonds, was invalid, and that there was nothing due or owing from the Terre Haute & Indianapolis Railroad Company by reason of such guaranty. Leave was given the purchasers. of the property at foreclosure sale to apply to the receiver for a surrender of the mortgaged premises and the additions thereto, and the decree directed that such surrender should accordingly be made.

A similar decree of foreclosure was entered a few days later in the United States Circuit Court for the Western District of Michigan, Southern Division, but so much of the bill as sought to recover against the Terre Haute & Indianapolis Railroad Company on the guaranty was dismissed, that question having already been adjudicated in this court. In and by said decrees of foreclosure it was found, adjudged, and decreed that the Indiana & Lake Michigan Railway Company was indebted to the Central Trust Company of New York, trustee, on account of said mortgage bonds, in the sum of $538,000, with interest thereon from June 15, 1898, at the rate of 5 per cent. per annum. It was further ordered in said decrees that the proceeds of sale of said mortgaged property should be applied, first, to the payment of interest and compensation of the master, the complainant, and counsel; second, to the payment of said amount found to be due, without preference of interest over principal or principal over interest. It was further provided that the complainant should be entitled to a judgment and execution for the deficiency,. if any, left unpaid after application of the proceeds of sale.

Thereafter, on December 8, 1898, a sale of said mortgaged property was had, and the same day sold for the sum of $100,000, leaving a deficiency of over $450,000.

On the 13th day of January, 1899, said sale was confirmed. On the same day the following entry was made in this case:

"Comes now the receiver, Volney T. Malott, by John G. Williams, his solicitor, comes also the Central Trust Company of New York, by Augustus L. Mason, its solicitor, and it appearing to the court that the mortgage of four hundred and eighty thousand dollars executed by the Indiana & Lake Michigan Railway Company to the Central Trust Company of New York, on or about September 2, 1889, has been foreclosed by decree of this court in the case of Central Trust Company of New York v. The Indiana & Lake Michigan Railway Company et al., No. 9,413, and by the decree of the United States Circuit Court for the Western District of Michigan, Southern Division, in the case of Central Trust Company of New York v. The Indiana & Lake Michigan Railway Company et al., No. 1,240, and it further appearing to the court that on December 8, 1898, a sale of the said Indiana & Lake Michigan Railway under said decree of foreclosure was made by William P. Kappes, special master in chancery, in said causes, which sale has been reported to each of said courts:

"Now, therefore, it is hereby ordered that upon the confirmation of said sale to the purchasers, Morgan G. Bulkeley and Moses L. Scudder, or their assigns, and the delivery of a deed for said property by the special master, the receiver shall, upon request of said purchasers, surrender to them or their assigns the possession of said Indiana & Lake Michigan Railway, and all property, rights, and franchises thereunto appertaining, as fully described and set forth in said decrees of foreclosure above referred to.

"It is hereby expressly provided that neither this order, nor the surrender of possession by said receiver to said purchasers or their assigns, shall be construed to affect in any manner the fund now in the hands of the receiver, known as the Lake Michigan fund, and consisting of twenty-five per cent. of the gross earnings of said Indiana & Lake Michigan Railway while in the receiver's hands, but the court expressly reserves to itself the right to make further orders concerning said fund, and the said Central Trust Company of New York is now granted leave to file an intervening petition in this cause touching the disposition of said Lake Michigan fund now in the receiver's hands."

Pursuant to the above leave granted, this intervening petition was filed January 31, 1899, and amended and refiled June 29, 1900.

The receiver was not a party to said foreclosure proceedings. On February 28, 1899, pursuant to the above order, the receiver surrendered possession of the said Lake Michigan Railway to the St. Joseph, South Bend & Southern Railroad Company, a corporation organized by the bondholders of the said Lake Michigan road, who had become the purchasers of the same at foreclosure sale through the bondholders' committee.

An appeal was taken by the petitioner from so much of said decree in said foreclosure proceedings as exonerated the Terre Haute & Indianapolis Railroad Company from all liability by reason of its said guaranty. Said decree was in all things affirmed by the United States Circuit Court of Appeals on January 2, 1900. 98 Fed. 666, 39 C. C. A. 220. Thereafter an application for writ of certiorari to the Supreme Court of the United States for a review of said decision was made and refused.

In operating the Indiana & Lake Michigan Railway Company's property the receiver herein kept separate accounts of its income and of the operating expenses thereof, and deposited 25 per cent. of its gross earnings, known and designated as the "Lake Michigan Fund," all as required by the order appointing him receiver herein. During the whole period he so operated said property he received as the gross earnings thereof the sum of $153,753.43, and he expended in operating said property the sum of $160,101.10. The 25 per cent. of the gross earnings of the property deposited by him as aforesaid to the credit of the Lake Michigan fund amounted in the aggregate to $38,438.37, and under the orders of this court he paid out of said Lake Michigan fund for taxes on said property the sum of $4,424.56, and the

balance now remaining to the credit of said fund is $34,013.81. During all the time he was operating said property the receiver herein made monthly reports to this court of its income and operating expenses, and of the deposits made by him to the credit of the Lake Michigan fund, and a tabulated statement of said reports is attached to the stipulation in this case, marked "Exhibit A."

The balance of the gross earnings derived from the operation by the receiver of the property of the Indiana & Lake Michigan Railway Company, after setting apart 25 per cent. thereof as a separate fund, was insufficient to meet the expenses of operating the property, and the receiver advanced and met such deficiency out of the gross earnings of the main line of railroad of said the Terre Haute & Indianapolis Railroad Company. The aggregate of all the amounts so advanced by him was $44,786.04, and neither this last-named sum nor any part thereof has been refunded in any way, but still remains wholly unpaid.

The profit and loss account of the receiver during the period of his possession of the Lake Michigan Railway, as appearing in his February, 1899, report, is as follows:

### November 14, 1896, to February 28, 1899.

| | | | | |
|---|---|---|---|---:|
| To 2/7 loss operating | St. L., V. & T. H. R. R., | 27 mo. 17 da.. | $ 55,151 71 |
| To " " " | I. & L. M. Ry., | 27 mo. 17 da.. | 42,653 97 |
| To " " " | T. H. & P. R. R., | 27 mo. 17 da.. | 178,064 43 |
| To balance, general account............................... | | | 386,410 75 |
| | | | $662,280 86 |

| | |
|---|---:|
| By profit operating T. H. & I. R. R., 27 mo. 17 da............ | $645,930 86 |
| By 1/5 profit from Indpls. Union Ry....................... | 16,350 00 |
| | $662,280 86 |

The property of the Terre Haute Company has been operated by the receiver at a large profit, and he now has in his hands as assets of that company a large sum, more than sufficient to pay the claim of the petitioner for the use of the Indiana & Lake Michigan Railroad by the Terre Haute Company from March 1, 1896, until November 13, 1896. The profit and loss account of the receiver from November 14, 1896, to September 30, 1902, as shown by his September, 1902, report, is as follows:

### November 14, 1896, to September 30, 1902.

| | | | | |
|---|---|---|---|---:|
| To 2/7 loss operating | St. L., V. & T. H. R. R., | 70 mo. 17 da.. | $ 11,726 79 |
| To " " " | I. & L. M. Ry., | 27 mo. 17 da.. | 44,786 04 |
| To " " " | T. H. & P. R. R., | 70 mo. 17 da.. | 538,947 93 |
| To balance per general account.......................... | | | 2,049,554 99 |
| | | | $2,635,015 75 |

| | |
|---|---:|
| By profit operating T. H. & I. R. R., 70 mo. 17 da.......... | $2,395,705 75 |
| By 1/5 profit Indpls. Union Ry........................... | 56,750 00 |
| By dividends Nos. 11 to 18, inclusive, on St. L., V. & T. H. R. R. Co. preferred stock.................................. | 182,560 00 |
| | $2,635,015 75 |

No compensation has ever been made to said Indiana & Lake Michigan Railroad Company or its bondholders for the use of its road by said Terre Haute Company from March 1, 1896, until November 13, 1896, nor for its use by the receiver from November 13, 1896, until February 28, 1899.

In respect to the percentage of gross earnings reserved by the receiver under his order of appointment from each of the leased lines except the Lake Michigan line, the following proceedings were had:

The Peoria bondholders obtained an order directing the receiver out of the funds in his hands to pay the interest coupons on the Peoria road which fell

due September 1, 1896. That portion of the Peoria fund not necessary for the above purpose, except disbursements for current taxes, is still in the receiver's hands.

From the foregoing order in behalf of the Peoria bondholders an appeal was taken to the United States Circuit Court of Appeals, and the decision was affirmed. Terre Haute, etc., R. Co. v. Cox, 42 C. C. A. 654, 102 Fed. 825. In this decision the Peoria lease was held to have been validated by an act of the Indiana Legislature passed in 1893. Out of the Vandalia lease percentage fund the receiver from time to time paid the taxes on the Vandalia road, and the interest on the mortgage bonds outstanding on said Vandalia road. The balance remaining after said payments being very considerable, it has been, under order of court, paid over to said St. Louis, Vandalia & Terre Haute Railroad Company, notwithstanding the fact that the Vandalia lease, like the one at bar, was ultra vires and void.

Out of the Logansport fund was paid the taxes and the interest maturing on the first mortgage of the Terre Haute & Logansport Railroad. The interest maturing on the second mortgage of said company was left unpaid.

The trustee of the second mortgage of the Terre Haute & Logansport Railroad Company began an independent suit in this court on the 30th day of December, 1896, for the foreclosure of said Logansport second mortgage. In this proceeding a cross-bill was filed by the Terre Haute & Indianapolis Railroad Company, setting up that its total expenditures in operating the Logansport road and in procuring betterments and equipments largely exceeded its receipts from said road. This excess was claimed as a lien prior to the second mortgage. The cross-bill was dismissed for want of equity, and on appeal to the Circuit Court of Appeals the so-called leases of the Logansport road were held to be ultra vires and the decree of the court below affirmed. 88 Fed. 913, 32 C. C. A. 130.

The Logansport road thereupon was sold under said foreclosure decree on said second mortgage. The court reserved from the operation of the decree the Logansport fund for future consideration by the court. On December 5, 1898, Harrison, trustee, in the Logansport second mortgage, filed his petition for application of the Logansport fund in the hands of the receiver, amounting approximately to $137,000, upon the deficiency remaining on his foreclosure decree obtained in the Logansport second mortgage. The purchaser of the Logansport road at foreclosure sale, having become a party to the proceedings, resisted such application of the Logansport fund on the ground that a portion of said fund should be used to exonerate the property from existing tax liens and from current interest on the first mortgage. The court ordered the Logansport fund paid to Harrison, trustee, for application on his deficiency in the foreclosure case. On appeal to the United States Circuit Court of Appeals this order was affirmed. 96 Fed. 907, 37 C. C. A. 615.

There was paid, however, to Harrison, trustee, only the balance of the Logansport fund remaining after all of the receiver's expenses in operating the road had been fully paid and satisfied. He accounted for all of the earnings of the property, including the Logansport fund, and charged against the entire earnings all the operating expenses of the property. He made no profit in operating the property. In settling the receiver's accounts for the operation of the Logansport road, it was necessary to apply a part of the Logansport fund to repay advances made by the receiver from the Terre Haute & Indianapolis fund, and on the petition of the receiver this court, under date of July 19, 1900, ordered that the receiver use the sum of $13,769.35, standing to the credit of the Logansport fund on May 31, 1900, in the payment and satisfaction of a like amount advanced by him out of the earnings of the Terre Haute & Indianapolis Railroad, to pay claims growing out of the receivership of the Terre Haute & Logansport property presented and allowed between the surrender, December 1, 1898, of the last-named property to the purchaser thereof, and May 31, 1900.

No payments have been made out of the Lake Michigan fund except for current taxes.

Counsel for petitioner states to the court that the interests of the petitioner and of the St. Joseph, South Bend & Southern Railroad Company, purchaser of the Lake Michigan road in said foreclosure decree, are identical, and that

he is authorized by said St. Joseph, South Bend & Southern Railroad Company to consent to the granting of the prayer of this petition, and to waive its rights, if any, as purchaser, in favor of said Central Trust Company, trustee.

During the receiver's possession of the Lake Michigan road, monthly statements of the gross earnings, the operating expenses, and the amount of the Lake Michigan fund were furnished each month to M. L. Scudder, chairman of the bondholders' committee of the Lake Michigan road.

During the entire period from March 1, 1896, to February 28, 1899, the Lake Michigan road was operated as part of the system of the Terre Haute & Indianapolis Railroad Company in immediate connection with the Logansport division, operated by said company, continuous trains being run between Terre Haute, Ind., and St. Joseph, Mich. During this period the Lake Michigan road had no rolling stock of its own. The Lake Michigan road begins on the dock at St. Joseph, Mich., on the St. Joseph river. It has some 1,800 feet of dock frontage, and had a large warehouse at that point, some 200 feet in length. It had a connecting track through one of the streets of the town of St. Joseph with what was at that time the Chicago & West Michigan Railroad. It had side tracks into several industries in St. Joseph, and had a single-track 60-pound steel rail from St. Joseph to South Bend, with side tracks at various points where there are stations. At South Bend it had a track reaching several industries, particularly the Studebaker Manufacturing Company, which was a large shipper of freight, and also a connection with a track into the Oliver Manufacturing Company, which was also a large shipper of freight. At South Bend it connected with the Terre Haute & Logansport Railroad, making the whole distance about 40 miles, with about 6 miles of side tracks. The road was in fair condition when turned over to the receiver and fairly maintained by him. Outside of the 50-feet right of way, the Indiana & Lake Michigan Railway Company owned no property in South Bend, no depots, no freighthouses, nor passenger stations. There were tracks other than the main track on the 50-foot right of way in South Bend, which were used as yards. St. Joseph, Mich., had harbor facilities. The Lake Michigan road connected at South Bend with the Terre Haute & Logansport, and crossed the Indiana, Illinois & Iowa, the Grand Trunk, and the Lake Shore railroads. At Galion it had a connection with the Michigan Central, and at St. Joseph with the Chicago & West Michigan. At St. Joseph it connected with the lake, as above described.

George L. Bradbury, witness for the petitioner, testified that he had been engaged in the railroad business for 33 years in the states of Indiana, Illinois, and Ohio, in different positions—as agent, conductor, general agent, general freight agent, general manager, vice president, and president. During the past 13 years he had been general manager of the Lake Erie & Western Railroad, with a division extending from Indianapolis to Michigan City. He was pretty familiar with the railroad business of Indiana, Illinois, and Ohio, and, in a general way, with the immediate locality of the Lake Michigan Railroad. Being asked what, in his judgment, would be a fair rent-for the Lake Michigan Railroad during the period it was operated by the receiver, taking into consideration or assuming that the tenant was the receiver of the Terre Haute & Indianapolis Railroad Company, and that during the receiver's tenancy he made only ordinary repairs, keeping the property reasonably safe for the operation of trains, and that the Lake Michigan road had no rolling stock of its own, he says, over the objection of respondent:

"In answering that question I should not take into consideration anything about the maintenance of the property, as I had no knowledge of its physical condition prior to the time that is alluded to nor during the time; simply taking the property in consideration as I know it now, I should fix a fair rental of the property at a minimum of $22,000 and a maximum of $25,000 —something between those two amounts—per annum, and taxes and maintenance."

The stipulation between counsel contains the following statement:

"(10) George L. Bradbury, whose deposition is on file herein, if re-examined would testify that in his opinion the use of the Indiana & Lake Michigan Railway by the Terre Haute & Indianapolis Railroad Company from March

1, 1896, to November 13, 1896, was reasonably worth as much as the use of the same by the receiver for a similar period of time."

He further testified:

"There are several elements on which I would form a judgment of the value. One is the distance, about 40 miles, the towns that it reaches, the terminals that it has, the value of its location, its railroad connections with the old Chicago & West Michigan, now I think the Pere Marquette. It reaches St. Joseph, with a good outlet for the lake, good dock privileges, with a town there of 7,500 people, with a number of industries, also good access to Benton Harbor, and a good bridge, giving it access to a number of industries; with the business it affords by the lake, and with the business at South Bend, with its connection to and as a connecting link between the roads at South Bend and the lake and the Pere Marquette road. Moreover, beyond all this, there is some local business along its line."

Moses L. Scudder, chairman of the bondholders' committee of the Lake Michigan road, testified for petitioner that he had been engaged for 20 years in examining railroad properties—negotiating and making investments in railroad securities. He was acquainted with the Lake Michigan road, and became president of the St. Joseph, South Bend & Southern Railroad Company, organized by the purchasers of said road at the foreclosure sale.

Being asked to express his opinion as to the value of the use of the Lake Michigan road by the receiver during the time he was in possession of it, he answered, over respondent's objection:

"From my experience with the property, my knowledge of it during the time of the receivership, I would say that the property, without rolling stock, had a fair rental value of from $15,000 to $20,000 a year. My estimate is based on my experience of the property, my knowledge of the fact that it had good terminals at St. Joseph, Mich., and also good terminals at South Bend, giving it a valuable entrance to the Studebaker and Oliver plants, from which large business was derived."

Mr. Scudder further testified that during the year immediately following the surrender of the property by the receiver the receipts, expenses, and net earnings were as follows:

### St. Joseph, South Bend & Southern Railroad.

Statement of operations for one year from March 1, 1899, to February 28, 1900.

#### Receipts.

| | | |
|---|---:|---:|
| Freight | $48,820 14 | |
| Passengers | 19,729 14 | |
| Express | 1,253 53 | |
| Mails | 2,754 58 | |
| Switching | 4,873 58 | |
| Track rental | 1,165 00 | |
| Car mileage | 2,875 26 | |
| Miscellaneous | 169 13 | |
| | $81,640 36 | $81,640 36 |

#### Expenses.

| | | |
|---|---:|---:|
| Maint. of way and structure | $13,896 89 | |
| "      " equipment | 4,139 99 | |
| Cond. transportation | 42,926 87 | |
| Gen. expenses | 13,378 27 | |
| | | $74,342 02 |
| Net earnings | | 7,298 34 |
| Taxes for 1898 | | 2,236 40 |
| Surplus | | $ 5,061 94 |

Mr. Scudder further testified that the item of $13,378.27 charged as general expense embraced the expenses in New York of the management of the

123 F.—29

property. About one-half of this item consisted of this expense. He further said:

"There were extraordinary expenses attending the organization of a new company, purchasing of rolling stock, and getting the various departments in condition for operation, which could not come in anywhere else, and were put in as general expenses. It was a much larger item than the same would have been if the road could have been subsequently continued under the operation of a new company."

The St. Joseph, South Bend & Southern Railroad Company provided itself with about $100,000 worth of equipment, which it used during the year in question.

Mr. Scudder further testified that at the end of the first year of operation of the road by the St. Joseph, South Bend & Southern Railroad Company the same was leased for a period of 50 years to the Indiana, Illinois & Iowa Railroad Company, for $20,000 per year, taxes and maintenance. The lease is exhibited with his deposition as Exhibit A. Mr. Scudder further testified that the said lessee took possession of the road in February, 1900, and that thereafter the stipulated rental had been paid by the lessee to the lessor.

Augustus Lynch Mason, for petitioner.
John G. Williams, for defendant.

BAKER, Circuit Judge (orally). At the threshold the question suggests itself, as has been heretofore indicated to counsel, with reference to the right of the Central Trust Company to institute and press this proceeding to recover on account of the relations which existed between the Terre Haute Company and the Lake Michigan Company.

The claim for the period from the 1st of March, 1896, to November 13, 1896, covers a time when there was no receivership and each railroad company was managing its own affairs. If there is now in existence a debt from the Terre Haute Company to the Michigan Company, I do not know whether it was included in the personal property of the Lake Michigan Company which passed at the sale to the purchaser. But if it did not pass to the purchaser, and there is a right in the creditors of the Lake Michigan Company to pursue the alleged debt owing by the Terre Haute Company to the Lake Michigan Company, that right, I think, would be in the owners of the debt, and not in the trustee, whose powers and duties were to follow up specific mortgaged property and apply it upon the debt. But as counsel have indicated that they desire the opinion of the court upon the merits of the claim, I pass the question above suggested.

The claim for the period from March 1, 1896, to November 13, 1896, is for rental for a part of the time while the Terre Haute Company was in possession of the Lake Michigan Company's road, during which time the Lake Michigan Company never declined to take rentals, and never insisted upon its right to take possession of the railroad, which had never lawfully passed from its hands. The lease entered into between these two railroad companies was void under the decisions of the Supreme Court as I understand them, not merely because a power was exercised that was not expressly or by implication within the charter, but essentially because the exercise of the ungranted power was in conflict with a well-defined public policy which forbade a railroad company to abandon or delegate to another

the performance of its public duties under its charter. That public policy forbade the two railroads to enter into the relation of lessor and lessee, and any written contract whereby they undertook to establish that relation between them was necessarily void by reason of that public policy. It therefore appears that the voidness of the lease did not flow from the terms or conditions of the lease as such, but from the incapacity of the parties to enter into that relationship. In those jurisdictions where a common-law marriage was provable although there were statutory regulations on the subject, I can understand how a common-law marriage could be proven to exist between parties who had capacity to enter into that relation under the formalities expressly prescribed by statute. But I cannot conceive that a common-law marriage would be implied from circumstances or evidence of the parties' conduct toward each other if they were within classes that were prohibited to enter into the marriage relation. I can understand how, if two individuals who have the legal capacity to enter into the relation of landlord and tenant have executed a lease which is void by reason of the manner or time of execution, the law from the facts showing the possession and use of the property would imply a lease; that is, would make a lease for the parties, and by means of evidence of value would fix the rental. But in this case, as already stated, the two railroads were forbidden by public policy to enter into the relation of landlord and tenant. It seems to me that if the courts, from the fact that the two railroads had nevertheless undertaken to enter into that relation, should imply that that relation was in fact created, it would not only subvert that public policy, but point out to the parties, or others in like situation and with like intention, how to evade the law.

In the Pullman Case, 171 U. S., on page 151, 18 Sup. Ct. 808, 43 L. Ed. 108, the court has stated the effect of the established rule to be that in no way, and through no channels, directly or indirectly, will the courts allow an action to be maintained where, in order to obtain a recovery, it is necessary to have recourse to such a contract. Any right of recovery must rest upon a disaffirmance, and the recovery is permitted only because of the desire of the courts to do justice as far as possible to the party who has delivered property under the void agreement, and which, in justice, he ought to be permitted to retake. "But courts will not in such endeavor permit any recovery which will weaken the rule founded upon the principles of public policy already noticed." It appears that the Lake Michigan Company has never at any time disaffirmed, but, on the contrary, knowingly entered into the forbidden relation, and appeared to be more than willing that that relation should continue, and that it should receive the moneys voluntarily paid by the Terre Haute Company. I think that to allow that relationship to be the basis on which the court would declare that a lease was implied, that an obligation existed to pay reasonable rental, would not merely, in the language of the Supreme Court, "weaken the rule founded upon the principles of public policy," but would completely subvert it. A disaffirmance by the Lake Michigan Company, a thing which it never did, would have given it the right to follow up and retake the property. In the present

case, however, there is no question but that the property has been surrendered in as good condition as that in which it was received.

There is a second period for which rent is claimed, namely, from November 13, 1896, when the receiver of the Terre Haute road was appointed, down to the time when possession was delivered to the purchaser of the Lake Michigan road in the foreclosure proceedings prosecuted against it by the Central Trust Company. The consideration above stated would lead as well to a denial of rentals for this second period.

But there is an additional reason why no recovery should be had during that time, or, at least, all of that time after the Central Trust Company and the bondholders knew by reason of getting statements from the receiver of the Terre Haute Company that the Lake Michigan road was not producing a gross income sufficient to pay the operating expenses. They had that knowledge within a very short time after the appointment of the receiver of the Terre Haute Company. They knew that the franchise covered by their mortgage, to be of value at the sale on the foreclosure of their mortgage, would require the road to be kept in operation. They knew that, if this court did not keep the franchise alive for their benefit by the operation of the road through the Terre Haute receiver, it would be necessary for them to press for the appointment of the receiver asked for in their bill against the Lake Michigan road. With this knowledge they never pressed the application for a separate receiver, and they never applied to this court to have the possession of the Lake Michigan road turned over to them in any way. So that, on this record, the bondholders have had the benefit, in the price that the Lake Michigan road brought at the sale, of the amount of money that was taken from the general funds of the Terre Haute receivership to make up the difference between the gross income of the Lake Michigan road and the operating expenses. This deficiency would have had to be met by receivers' certificates or otherwise, which would have been a charge upon the body of the Lake Michigan road ahead of the bonds represented by the Central Trust Company.

These, briefly, are the reasons that lead me to direct an order dismissing the petition for want of equity.